**Docket No. 22-3395**

*IN THE UNITED STATES COURT OF APPEALS*
*FOR THE THIRD CIRCUIT*

_____

**UNITED STATES OF AMERICA**

**v.**

**DARIUS CARTER,**

**Defendant-Appellant**

_____

On Appeal from Judgment of Conviction and Sentence in the
United States District Court for the Eastern District of Pennsylvania
No.  2:19-cr-00078-JS (Sanchez, C.J.)

_____

**BRIEF FOR APPELLANT CARTER**

(including Volume 1 Appendix – pp. 1a–31a )

JOSEPH P. GREEN, JR.

*PA Atty I. D. No. 32604*
*18 South New Street*
*West Chester, PA  19382*
*Telephone:  (610) 692-0500*
*josephpgreen@gmail.com*

Counsel for appellant Carter

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Issues with Placed Raised and Ruled Upon . . . . . . . 1

Related Cases and Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT:

     1.     THE DISTRICT COURT'S DENIAL OF APPELLANT'S
MOTION TO SUPPRESS VIOLATED HIS FOURTH AMENDMENT
RIGHT TO BE FREE FROM UNLAWFUL ARREST, REQUIRING
REVERSAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     2.     THE DISTRICT COURT'S DENIAL OF APPELLANT'S
REQUESTS FOR APPOINTMENT OF NEW COUNSEL OR SELF-
REPRESENTATION, VIOLATED HIS SIXTH AMENDMENT RIGHTS
AND WARRANT A NEW TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . 28

     3.     THE DISTRICT COURT ABUSED ITS DISCRETION IN
ADMITTING APPELLANT'S PRETRIAL TEXT MESSAGES TO A
WITNESS BECAUSE THE PROBATIVE VALUE OF THOSE
COMMUNICATIONS WAS SUBSTANTIALLY OUTWEIGHED BY
THEIR PREJUDICIAL EFFECT, RESULTING IN PREJUDICIAL
ERROR WARRANTING THE GRANT OF A NEW TRIAL . . . . . . . . 37

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Required Certifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Volume I Appendix

1. Notice of Appeal (DDE 112), filed 12/17/2022 . . . . . . . . . . . . . . . . . 1a

2. Judgment of sentence (DDE 111), Filed 12/09/2022, entered . . . . . 2a

3. Order (DDE 35), filed 11/25/2019, denying Motion To Suppress . . . 9a

4. Memorandum Opinion (DDE 40), filed 11/29/2019,
denying Motion To Suppress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10a

4. Order (DDE 56), filed 12/05/2019 granting Government's Motion *in
limine* to Introduce Rule 404(b) Evidence . . . . . . . . . . . . . . . . . . . . . 29a

# TABLE OF AUTHORITIES

## CASES

*Adams v. United States ex rel. McCann*, 317 U.S. 269 (1942) . . . . . . . 34

*Brown v. Illinois*, 422 U. S. 590 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Brown v. Texas,* 443 U.S. 47 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Davis v. Mississippi,* 394 U.S. 721 (1969) . . . . . . . . . . . . . . . . . . . 21, 22

*Faretta v. California*, 422 U.S. 806, 820 (1975) . . . . . . . . . . . . . . . . . . 34

*Hayes v. Florida,* 470 U.S. 811 (1985) . . . . . . . . . . . . . . . . . . . . . 21, 22

*Huddleston v. United States*, 485 U.S. 681 (1988) . . . . . . . . . . . . . . . 40

*Mack v. Yost*, 63 F.4th 211 (3d Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . 41

*Segura v. United States*, 468 U.S. 796 (1984) . . . . . . . . . . . . . . . . . . . . 26

*United States v. Bailey*, 840 F.3d 99 (3d Cir. 2016) . . . . . . . . . . . . . . 37

*United States v. Caldwell*, 760 F.3d 267 (3d Cir. 2014) . . . . . . . . . . . 42

*United States v. Claxton*, 766 F.3d 280 (3d Cir. 2014) . . . . . . . . . . . . 42

*United States v. Diaz*, 951 F.3d 148 (3d Cir. 2020) . . . . . . . . . . . . . . 28

*Faretta v. California*, 422 U.S. 806 (1975) . . . . . . . . . . . . . . . . . . . 33, 36

*United States v. Foster*, 891 F.3d 93, 106, (3d Cir. 2018) . . . . . . . . . . . 22

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006) . . . . . . . . . . . . . 33

*United States v. Hester*, 910 F.3d 78 (3d Cir. 2018) . . . . . . . . . . . . . . . 15

*United States v. Peppers*, 302 F.3d 120 (3d Cir. 2002) . . . . . . . . . . 28, 35

*United States v. Repak*, 852 F.3d 230 (3d Cir. 2017) . . . . . . . . . . 40, 43

*United States v. Senke*, 986 F.3d 300 (3d Cir. 2021) . . . . . . . . . . . . . . 32

*United States v. Sharpe*, 470 U.S. 675 (1985) . . . . . . . . . . . . . . . . . . . 22

*Utah v. Strieff*, 579 U.S. 232 (2016) . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*United States v. Taylor*, 21 F.4th 94 (3d Cir. 2021) . . . . . . 28, 33, 34, 35

*United States v. Welty*, 674 F.2d 185 (3d Cir. 1982) . . . . . . . . . . . . . . 32

*United States v. Williams*, 974 F.3d 320 (3rd Cir. 2020), . . . . . . . . . . . 15

*United States v. Wrensford*, 866 F.3d 76 (3d Cir. 2017) . . . . . . . . . 21, 26

*Wong Sun v. United States*, 371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . 26

## **Statutes**

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
18 U.S.C. § 3742(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
18 U.S.C. $ 1951(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## **OTHER AUTHORITIES**

Lajevardi, N*., The Media Matters: Muslim American Portrayals and the Effects on Mass Attitudes*, 83 Journal of Politics 1060 (July, 2021) . . . . . . . . . . . . . . . . . . . . . . 41

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. Appellate jurisdiction rests upon 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2). The judgment was entered on December 8, 2022. A timely notice of appeal under Fed.R.App.P. 4(b) was filed on December 17, 2022.

## STATEMENT OF THE ISSUES
## WITH STATEMENT OF PLACE RAISED

1.    Did the district court's denial of appellant's motion to suppress violate his fourth amendment right to be free from unlawful arrest, requiring reversal?

Where Raised and Ruled Upon: Motion To Suppress, DDE 19 (filed 6/12/2019); *Order* denying Motion, DDE 35, (filed 11/25/2019). 9a; *Memorandum Opinion* in support of Order, DDE 40 (filed 11/29/2019) 10a.

2.    Did the district court's denial of appellant's requests for appointment of new counsel or self-representation violate his Sixth Amendment rights and warrant a new trial?

Where Raised and Ruled Upon: Request for appointment of new

counsel or for self-representation, N.T. 12/2/2019, at 13 ("I pick to go by myself.")   Ruling *Id.*, at 40 (I am not going to permit him to represent himself and  I'm going to direct that you continue to represent him.).

3.     Did the District Court abuse its discretion in admitting appellant's pretrial text messages to a witness, when the probative value of those communications was substantially outweighed by their prejudicial effect, resulting in prejudicial error warranting the grant of a new trial?

Where Raised and Ruled Upon

Government *Motion in limine to admit 404(b) evidence* (DDE 37); Defendant's *Response To Motion* (DDE 42) (contending that the messages in question were substantially more prejudicial than probative;)[1] Ruling in *Order* Granting Motion in limine in part, (DDE 56) (filed 12/5/19), 29a, ("The Court concludes the text messages Carter sent to B.W. should be admitted because they are relevant to prove Carter's consciousness of guilt and they are more probative than

---

[1]     In her Response to the government's Motion, trial counsel conceded that the text messages were relevant as evidence of consciousness of guilt. Counsel for appellant here acknowledges that appellant is bound by that concession on this direct appeal.

prejudicial.")

## **RELATED CASES AND PROCEEDINGS**

None.

## **STATEMENT OF THE CASE**

Darius Carter was Indicted and charged with two counts of Hobbs Act Robberies in violation of 18 U.S.C. $ 1951(a) (interference with interstate commerce by robbery). These robberies of retail cell phone stores, both on North 5th Street in Philadelphia, occurred on October 18, 2018, at the Boost Mobile store, and on October 23, 2018, at the Metro PCS store.

Mr. Carter was confronted and detained by Philadelphia police officers on October 26, 2018, about a mile away from the scene fo the Robberies.  N.T. 6/17/2019, at 12-13. He was searched, and then transported, in custody, to the police station so that he could be fingerprinted and identified. After he was fingerprinted, he was identified and a state parole violation Warrant was discovered. He was then turned over to state custody while investigation continued.

Police officers constructed a photo array including Mr. Carter's

3

photo. He was identified by one of the clerks, and subsequently charged with both of the Robberies by Indictment filed on January 31, 2019.

A hearing was held on the Motion To Suppress on June 17, 2019. Officer Bellon testified that he was assigned to the "beat" where the businesses were locate don North 5th Street, and conducted some investigation. He testified that, on October 23rd he responded to the MetroPCS report of a robbery. *Id.*, at 17. He met with the store manager, Nadim Katbeh, and a clerk who had been present for the robbery. They provided a "collective" description of the single subject as

> a Black male, approximately hundred and fifty pounds, blue Adidas jacket, blue pants, dark bandana on face."

*Id.*, at 20-21.

Officer Bellon testified that he was then aware that a similar robbery had occurred at a cell phone store on the same block on October 18th. *Id.*, at 23. He had learned from a police bulletin that the 2 subjects involved in that robbery at the Boost Mobile store were described as

> It's a Black male, five nine, twenties, black pants with stripes on the side, dark navy blue hoodie, black sneakers, gloves, mask, blue school bag with a semi- automatic handgun, black in color.

*Id.*, at 47.

Officer Bellon then explained that he had found 3 separate surveillance videos from surrounding areas that he found relevant: "first video from the Speedway is the gas station video. The second one is a corner store video. And then the third video is a housing development that has cameras on it." *Id.*, at 28. This housing complex is near 8th and Somerset Streets, *Id.*, at 50, approximately 0.4 miles from the Fifth Street location of the robbery. He testified that he believed that the videos each depicted the same black male walking toward the North Fifth Street areas before the two robberies. *Id.*, at 37-44 (October 23rd), at 47.

The trial court candidly described this description and observed that these were "Very general description that matches . . almost every African-American in the city; right? Of his height and weight." *Id.*, at 181. Based on his review of the videos in question, the trial judge also noted that "I'm not so sure, from what I see in the video, it's the same person." *Id.*, at 180. The defendant is 41 years old, and does not appear to be in his twenties.

Officer Bellon next testified that on October 26th he was working

at 13th and Cambria Streets, "a little less than a mile" from the robberies on North Fifth Street. *Id.,* at 52. At that location he saw the defendant walk into a beer take-out. *Id.*, at 53. He testified that he believed that the defendant was the same man he had seen in the apartment complex video walking after the second robbery on October 23rd. *Id.*, at 54-55.

The Officer testified that, when he saw Mr. Carter a mile from the scene of the robberies, it was his purpose to stop him regarding this October 23rd robbery. *Id.*, at 59. Mr. Carter was handcuffed and searched and found not to be in possession of any weapons. *Id.*, at 60. He was placed in a police car so that the officers could perform an identification procedure. *Id.*, at 65. (we can run him, we can check, see if his license comes back if he has any history, *and then we can go further information from there*.) This was not intended to facilitate a show-up identification procedure with an eyewitness. It was intended to facilitate further interrogation and investigation of the robberies *at the police station*.

In due course, the trial court denied the Motion To Suppress and

the matter was scheduled for trial. At the pretrial conference, Mr.

Carter asked that hsi court-appointed counsel be replaced because he

felt that she had misrepresented her plea discussions with the

prosecutor. N.T. 12/2/2019, at 15. The trial court decided that

defendant had not established good cause to replace the existing

appointed counsel. *Id.*, at 21-22, 32. ("I'm not satisfied that in this

particular case you have articulated just good cause for me to, at this

stage in the proceedings, remove her from your case.")  The trial court's

inquiry regarding the conduct of present counsel was perfunctory, at

best.[2]

When the trial court first indicated that he would not replace

---

[2]    The trial court's analysis of the appellant's complaint about his appointed counsel may best be summarized with this quote:

> So I don't know where he's coming across about the communication you had with him and his misunderstanding, but it's a pretty serious allegation to be claiming that you lied to him and that that is the basis upon which I ought to remove you from this case at this late hour, because I'm not likely to do that.

MS. JAYARAMAN: I understand. I –

THE COURT: Because I don't believe that's what happened.

N.T. 11/2/2019, at 14.

appointed counsel, he told the defendant he had two choices: "You either go to trial by yourself on Monday or you continue with her representation." Appellant requested that he be permitted to represent himself: "I pick to go by myself." N.T. 11/2/2019, at 13.

Thereafter, the trial court conducted a colloquy with Mr. Carter on self-representation, and outlined all of the difficulties that he could face in self-representation. The Court then asked if appellant really wanted to represent himself:

> THE COURT: And understanding all of that, are you telling me really that you want to represent yourself?

> THE DEFENDANT: I've never wanted to represent myself.

> THE COURT: So you want me to just give you another lawyer last minute, continue this case and give you another lawyer, right? That's what you really want, right?

> THE DEFENDANT: Your Honor, with all due respect, I feel wholeheartedly that I was deceived. I believe that my law -- my attorney applied unethical means to try to deceive me, and I have lost complete faith, confidence. I -- honestly, I -- this is -- this is late. I understand that. But these developments have just taken place. And I -- with the severity of what I'm facing and what's coming up, I think that going forward, I can't proceed. I don't think that it's fair to even proceed under these circumstances.

> THE COURT: I got news for you.

> THE DEFENDANT: It's like -- it's like under duress at this

point.

> THE COURT: Could be duress or not. You take it up on appeal. But I got news for you, I don't see good cause for me to appoint another lawyer. I don't think you really want to represent yourself. And I think I'm in a position to continue to direct Attorney Jayaraman to represent you. I don't see good cause.

N.T. 11/2/2019, at 37-39.

The subject was revisited briefly during trial. Appellant asked to be able to make a record on the issues he had raised regarding his appointed counsel, who had chosen not to cross-examine the government's principal identification eye-witness. The trial court stated that

> So it seems to me you're going to have to wait until your 2255 and wait until the verdict to raise issues challenging how your lawyers are handling the case and handling the competency of your lawyers.

N.T. 12/10/2019, at 7.

In the run-up to the trial, the government filed a Motion seeking to admit messages that Mr. Carter had sent to his former girlfriend, Brittany Waller, a witness called by the government at trial. The government introduced two particularly prejudicial exhibits as Exhibits 28-C and 28-D. The first, Exhibit 28-C, was a text message sent to Ms.

Waller, attributed to Mr. Carter, read into the record as follows:

> When I first read the statement you gave I thought she was scared and did what she thought was best, no blame. But when I seen the photos of you taking my stuff to the station and then for you to lie about it -- no, they didn't get my stuff from your house, you took it down there -- I thought why would you want to betray me in such a matter? Why would you tell on me? We used to have a running joke that I would not do anything to make you kill me because I didn't want to see you in prison. Why do you want to see me in prison? I would have did yours and my time. Your betrayal is worse than death. I (sic) your goal was to take me away from my kids and have me spend my last days in prison, congrats, you succeeded. Shame on you. The fact that you lied about means you know you're wrong.

N.T. 12/10/2019, 268-269. Ms. Waller then testified that this message made her "Uncomfortable, fearful." *Id.*, at 270. There was no explanation offered for why it made her fearful.

Secondly, the government introduced Exhibit 28-D, a text message attributed to appellant, sent to Ms. Waller from an account at the FDC, which read as follows:

> Surah 7:178, 'Whomsoever Allah guides, he is the guided one, and whomsoever he sends astray, then those, they are the losers.' Surah 3:30, 'On the day when every person will be confronted with all the good he has done and all the evil he has done, he will wish that there were great distance between him and his evil.' You think you're winning now, but not for long. If you knew what I know, you would laugh less and cry more."

> I just want you to know I forgive you, H-O-M-M,"

N.T. 12/10/2019, 271-272. Ms. Waller then testified that the message made her "fearful." *Id.*, at 272. There was no explanation offered for why it made her fearful.

At trial, the store clerk, Mr. Nadim Katbeh, testified and identified Mr,. Carter as the robber. Ms. Waller also testified, and identified Mr. Carter as the person captured by store surveillance robbing the store. Mr. Carter testified that he had not robbed either store or been present for either store robbery. He was found guilty by the jury.

Sentencing was scheduled and delayed first for appointment pf new counsel and then for a psychological evaluation in connection with sentencing. On December 8, 2022, Mr. Carter was sentenced to imprisonment for 134 months, to serve 3 years supervised release, to pay a special assessment of $200, and to make restitution in the amount of $1,135.

The judgment was filed on December 9, 2022, and this timely appeal was filed on December 17, 2022.

## SUMMARY OF ARGUMENT

The district court clearly erred in denying Mr. Carter's Motion To Suppress, and in expanding the Terry stop to permit extended custodial detention solely so police could determine a citizen's identity. Whatever "reasonable suspicion" that police officers subjectively held was insufficient to justify compulsory custodial fingerprinting. The transportation for fingerprinting at the police station unreasonably lengthened the detention without furthering a proper purpose, and constituted a de facto illegal arrest.  The trial court erred in concluding to the contrary, and in refusing to suppress all evidence acquired as a result of that illegality.

The trial court erred in refusing appellant's request for appointment of new counsel, and in preventing appellant from exercising his Sixth Amendment right to self-representation at trial. The trial court failed to conduct a proper colloquy in refusing the request to replace counsel, and thereafter failed to perform a proper colloquy before refusing to permit self-representation. These are structural errors, and so the trial court's error may not be deemed harmless.

12

The district court clearly erred and manifestly abused its discretion in admitting text messages from appellant to his former girlfriend, called at trial as a government witness, because those messages dangerously prejudicial. The admission of these communications invited anti-Muslim bias, and that danger greatly, and substantially, outweighed any proffered probative value.

## ARGUMENT

**1.    THE DISTRICT COURT'S DENIAL OF APPELLANT'S MOTION TO SUPPRESS VIOLATED HIS FOURTH AMENDMENT RIGHT TO BE FREE FROM UNLAWFUL ARREST, REQUIRING REVERSAL.**

Standard of Review:

Review is for clear error as to the District Court's findings of fact, and plenary as to legal conclusions in light of those facts. *United States v. Williams*, 974 F.3d 320, 350, (3rd Cir. 2020), citing *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018).

Discussion:

Mr. Carter was unlawfully arrested without probable cause when he was detained, hand-cuffed and transported in a police car for compulsory fingerprinting. The transportation for fingerprinting at the police station unreasonably lengthened the detention without furthering a proper purpose, and constituted a de facto illegal arrest. The trial court erred in concluding to the contrary, and in refusing to suppress all evidence acquired as a result of that illegality.

*1.    The information available to the Officer*

Two Philadelphia police officers confronted Mr. Carter in a

14

convenience store on October 26, 2018, immediately handcuffed him and searched his person, and took him from the store "to identify him." They held him handcuffed for transport to the station, and he was driven away in a marked police vehicle by other officers for compelled fingerprinting and identification. The officers acknowledged that he was going to be held until they could determine whether he had any outstanding warrants. Officer Bellon specifically testified that Mr. Carter  was going to be held until the police could confirm his identity and confirm that he had no warrants. Id.[3] N.T. 6/17/2019, at 67.

The government contended that the officers had conducted a proper investigative detention for the purpose of identifying Mr. Carter, based on reasonable suspicion that Carter had been involved in two robberies on October 18th and October 23rd approximately one mile from the scene of the detention. N.T. 6/17/2019, at 12-13. Officer Bellon

---

[3]      At the suppression hearing, Officer Bellon testified that, while Mr. Carter was en route to the station, "he stated that he was lying about his name and that he had a warrant." This was hearsay, but originally not objected to by then-counsel. N.T. 6/17/2019, at 67-69. Defense counsel made a belated objection that was sustained by the trial court. However, the government then offered the transport statement as "admissible" hearsay and the trial court permitted its introduction.

testified that he patrolled a business area in North Philadelphia,
described as a "business beat." On October 23rd he responded to the
MetroPCS report of a robbery on the 2700 block of North 5th Street. *Id.*,
at 17. He met with the store manager, Nadim Katbeh, and a clerk who
had been present for the robbery. They provided a "collective"
description of the single subject as

> a Black male, approximately hundred and fifty pounds, blue
> Adidas jacket, blue pants, dark bandana on face."

*Id.*, at 20-21.

Officer Bellon testified that he was then aware that a similar
robbery had occurred at a cell phone store on the same block on October
18th. *Id.*, at 23. He had learned from a police bulletin that the 2 subjects
involved in that robbery at the Boost Mobile store were described as

> It's a Black male, five nine, twenties, black pants with stripes on
> the side, dark navy blue hoodie, black sneakers, gloves, mask,
> blue school bag with a semi- automatic handgun, black in color.

*Id.*, at 47.

Officer Bellon then explained that he had found 3 separate
surveillance videos from surrounding areas that he found relevant:
"first video from the Speedway is the gas station video. The second one

16

is a corner store video. And then the third video is a housing development that has cameras on it." *Id.*, at 28. This housing complex is near 8th and Somerset Streets. *Id.*, at 50, approximately 0.4 miles from the Fifth Street location of the robbery. He testified that he believed that the videos each depicted the same black male walking toward the North Fifth Street areas before the two robberies. *Id.*, at 37-44 (October 23rd), at 47.

Officer Bellon next testified that on October 26th he was working at 13th and Cambria Streets, "a little less than a mile" from the robberies on North Fifth Street. *Id.,* at 52. At that location he saw the defendant walk into a beer take-out. *Id.*, at 53. He testified that he believed that the defendant was the same man he had seen in the apartment complex video walking after the second robbery on October 23rd. *Id.*, at 54-55.

No probable cause, and not even reasonable suspicion, arose from the generic descriptions here and the officer's observation of a similar black man walking in the area of the robberies. The descriptions provided by witnesses were very generic - and would capture every

black man in Philadelphia of average height and weight, wearing dark clothing, who was in his twenties. The suspect described by the October 18th eyewitnesses was a black man, 5'9", in his twenties wearing black pants with stripes. The suspect described by the October 23rd eyewitness was a Black male, approximately hundred and fifty pounds, with a blue Adidas jacket, blue pants, and a dark bandana on his face. The trial court candidly described this description and observed that these were "Very general description that matches . . almost every African-American in the city; right? Of his height and weight." *Id.*, at 181. Based on his review of the videos in question, the trial judge also noted that "I'm not so sure, from what I see in the video, it's the same person." *Id.*, at 180. The defendant is 41 years old, and does not appear to be in his twenties.

 2. *The purpose of the stop*

 The Officer testified that, when he saw the defendant a mile from the scene of the robberies, it was his purpose to stop him regarding this October 23rd robbery. *Id.*, at 59. Mr. Carter was handcuffed and searched and found not to be in possession of any weapons. *Id.*, at 60.

He was placed in a police car so that the officers could perform an identification procedure. *Id.*, at 65. (we can run him, we can check, see if his license comes back if he has any history, *and then we can go further information from there*.) This was not intended to facilitate a show-up identification procedure with an eyewitness. It was intended to facilitate further interrogation and investigation of the robberies *at the police station*.

3.    *The investigatory detention became a de facto arrest when the officers detained Mr. Carter for transportation for a procedure to ascertain his identity.*

The point at which a permissible "brief investigatory detention" becomes an unlawful custodial arrest is sometimes difficult to determine. In this case the initial detention became unreasonable when the officers placed him handcuffed in a police car and transported him to the district for a compelled fingerprinting procedure that was not likely either to confirm or dispel the officer's suspicion that Mr. Carter had committed the robberies in question.

This Court has held that custodial transportation away from the initial detention transforms an investigatory detention into a custodial

arrest. *United States v. Wrensford*, 866 F.3d 76, 87 (3d Cir. 2017) (stop converted to arrest when defendant was involuntarily transported from street and placed in jail cell), citing *Hayes v. Florida,* 470 U.S. 811, 816 (1985) (holding that an illegal arrest occurred when the defendant was transported, without probable cause, from his home to the police station for fingerprinting) and *Davis v. Mississippi,* 394 U.S. 721, 724-28, 676 (1969) (ruling that an unreasonable seizure occurred when police brought the defendant to the police station without probable cause, a warrant, or his consent for fingerprinting and brief questioning before he was released).

This Court has also held that transportation alone does not convert detention to custodial arrest if the police "diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly[.]" *United States v. Foster*, 891 F.3d 93, 106, (3d Cir. 2018) citing *United States v. Sharpe*, 470 U.S. 675, 685-86 (1985). In *Foster,* the Court held that returning a suspect to a scene for a prompt eye-witness show-up identification procedure was constitutionally permissible.

In this case, the police had no reasonable basis for concluding that learning the suspect's identity would "quickly" confirm or dispel their suspicion that he had committed the robberies in question. This was not a fingerprint case: securing fingerprints wouldn't quickly confirm or dispel Officer Bellon's suspicion as there were no fingerprints collected in the robbery investigations.

While some detention for identification procedures can be permitted without probable cause, custodial identification procedures require probable cause. This is the teaching of *Hayes v. Florida,* and *Davis v. Mississippi.* The Fourth Amendment does not countenance compelled self-identification procedures. When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits. *Brown v. Texas,* 443 U.S. 47, 52, 99 S. Ct. 2637, 2641, 61 L. Ed. 2d 357, 363, (1979).

    *4.    The trial court erred as a matter of law in concluding that this was a detention for identification permitted by the Fourth Amendment.*

The trial court concluded that Mr. Carter was properly detained when he was taken into custody for a compelled identification

procedure. *Opinion*, Doc 40, at 10. The trial court cited this Court's decision in *Foster*, supra, for the proposition that "Transporting a defendant a short distance for identification purposes is not outside the scope of a *Terry* stop." The trial court failed to consider the purpose of the stops here and in *Foster*.

In *Foster*, this Court approved the detention and return of a suspect for a show-up identification by an eyewitness.  891 F.3d 106. This Court emphasized that this procedure was proper because it would quickly confirm or dispel the officer's suspicion. In the case at bar, however, compelling identification by fingerprinting had no reasonable prospect of confirming or dispelling the officer's suspicion that Mr. Carter committed the robberies.

The trial court erred here as a matter of law when it concluded that custodial transportation for the officer's stated purpose to "see if his license comes back if he has any history, *and then we can go further information from there*" would quickly confirm or dispel the officer's suspicion regarding his involvement in the robberies in question.

    5.    *The illegality of the custodial detention required suppression of the identification procedures later undertaken as a result of this*

*unlawful custodial arrest.*

Because the trial court concluded that no unlawful arrest had occurred, it conducted no meaningful analysis of whether evidence should be suppressed as the fruit of the poisonous tree. *Memorandum Opinion*, at 16, 25a.[4]

The trial court suggested that the subsequent discovery of an unrelated state arrest warrant would constitute an "intervening event" that would prevent suppression, citing *Utah v. Strieff*, 579 U.S. 232 (2016). In order to assess whether a subsequent event would constitute

---

[4]    The trial court's treatment of the taint issue appears in one paragraph of its Opinion, as follows:

> Since Carter's seizure was constitutional, the evidence the police collected should not be suppressed under the fruit of the poisonous tree doctrine. The Court briefly notes, however, that the valid state warrant in this case would likely be an intervening event which would prevent the suppression of evidence the police found after they discovered the warrant. *See Utah v. Strieff*, [579 U.S. 232 ],136 S. Ct. 2056 (2016) ("The outstanding arrest warrant for [the defendant's] arrest is a critical intervening circumstance that is wholly independent of the illegal stop. The discovery of that warrant broke the causal chain between the unconstitutional stop and the discovery of evidence.")

*Memorandum Opinion*, at 16, 25a.

an intervening event sufficient to break the causal chain, a court must

apply the analysis outlined in *Brown v. Illinois*, 422 U. S. 590 (1975).

See, *Utah v. Strieff*, 579 U.S. 232.[5] The trial court erred by failing to

conduct such an analysis here.

All evidence obtained as a result of this unlawful arrest –

including statements Mr. Carter made to Officers Bellon and Rosa, the

subsequent identification made by N.K., N.K.'s October 31, 2018,

statements, the eyeglasses and articles of clothing confiscated from

Kintock Group on November 2, 2018, the physical evidence obtained

from Brittany Waller on November 8, 2018, and any other evidentiary

---

[5]     In *Strieff,* the Court explained its suppression analysis as
follows:

> The three factors articulated in *Brown v. Illinois*, 422 U. S. 590,
> 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), guide our analysis. First,
> we look to the "temporal proximity" between the unconstitutional
> conduct and the discovery of evidence to determine how closely
> the discovery of evidence followed the unconstitutional search. *Id.*,
> at 603, 95 S. Ct. 2254, 45 L. Ed. 2d 416. Second, we consider "the
> presence of intervening circumstances." *Id.*, at 603-604, 95 S. Ct.
> 2254, 45 L. Ed. 2d 416. Third, and "particularly" significant, we
> examine "the purpose and flagrancy of the official misconduct."
> *Id.*, at 604, 95 S. Ct. 2254, 45 L. Ed. 2d 416.

*Utah v. Strieff*, 579 U.S. 232.

items – must be suppressed because they were ultimately derived from the defendant's unlawful arrest. *See Brown v. Illinois*, 422 U.S. 590, 602-04 (1975). Indeed, N.K.'s identification was a direct result of the unlawful arrest of Mr. Carter as were statements made and all physical evidence recovered. *See Segura v. United States*, 468 U.S. 796, 804 (1984) ("[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search and seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'"). *See also*, *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

We acknowledge that, as in *Wrensford*, supra, this Court could conclude that the trial court erred in finding the detention proper, and remand for an analysis of (1) whether any exception to the Fourth Amendment might apply, or (2) whether a "meaningful intervening event" might have broken the connection between the illegal de facto arrest and the proffered evidence.

**2.    THE DISTRICT COURT'S DENIAL OF APPELLANT'S REQUESTS FOR APPOINTMENT OF NEW COUNSEL OR SELF-REPRESENTATION, VIOLATED HIS SIXTH AMENDMENT RIGHTS AND WARRANT A NEW TRIAL.**

<u>Standard of Review:</u>   The Court reviews a district court's decision not to permit substitution of counsel for abuse of discretion. *United States v. Diaz*, 951 F.3d 148, 154, (3d Cir. 2020). The Court conducts plenary review of the District Court's determination of whether a defendant may exercise his Sixth Amendment right to self-representation. *United States v. Taylor*, 21 F.4th 94, 99, (3d Cir. 2021), citing  *United States v. Peppers*, 302 F.3d 120, 127 (3d Cir. 2002).

<u>Discussion:</u> The trial court erred in refusing appellant's request for appointment of new counsel, and in preventing appellant from exercising his Sixth Amendment right to self-representation at trial. The trial court failed to conduct a proper colloquy in refusing the request to replace counsel, and thereafter failed to perform a proper colloquy before refusing to permit self-representation. These are structural errors, and so the trial court's error may not be deemed harmless.

The trial court here was faced with a two-pronged inquiry.

26

Appellant first asked that his appointed counsel be replaced because he felt that she had misrepresented her plea discussions with the prosecutor. N.T. 12/2/2019, at 15. The trial court decided that defendant had not established good cause to replace the existing appointed counsel. *Id.*, at 21-22, 32. ("I'm not satisfied that in this particular case you have articulated just good cause for me to, at this stage in the proceedings, remove her from your case.")  The trial court's inquiry regarding the conduct of present counsel was perfunctory, at best.[6]

When the trial court first indicated that he would not replace appointed counsel, he told the defendant he had two choices: "You either go to trial by yourself on Monday or you continue with her

---

[6]    The trial court's analysis of the appellant's complaint about his appointed counsel may best be summarized with this quote:

> So I don't know where he's coming across about the communication you had with him and his misunderstanding, but it's a pretty serious allegation to be claiming that you lied to him and that that is the basis upon which I ought to remove you from this case at this late hour, because I'm not likely to do that.

MS. JAYARAMAN: I understand. I –

THE COURT: Because I don't believe that's what happened.

N.T. 11/2/2019, at 14.

representation." Appellant requested that he be permitted to represent himself: "I pick to go by myself." N.T. 11/2/2019, at 13. Thereafter, the trial court conducted a colloquy on self-representation, and outlined all of the difficulties that he could face in self-representation. The Court then asked if appellant really wanted to represent himself:

> THE COURT: And understanding all of that, are you telling me really that you want to represent yourself?
>
> THE DEFENDANT: I've never wanted to represent myself.
>
> THE COURT: So you want me to just give you another lawyer last minute, continue this case and give you another lawyer, right? That's what you really want, right?
>
> THE DEFENDANT: Your Honor, with all due respect, I feel wholeheartedly that I was deceived. I believe that my law -- my attorney applied unethical means to try to deceive me, and I have lost complete faith, confidence. I -- honestly, I -- this is -- this is late. I understand that. But these developments have just taken place. And I -- with the severity of what I'm facing and what's coming up, I think that going forward, I can't proceed. I don't think that it's fair to even proceed under these circumstances.
>
> THE COURT: I got news for you.
>
> THE DEFENDANT: It's like -- it's like under duress at this point.
> THE COURT: Could be duress or not. You take it up on appeal. But I got news for you, I don't see good cause for me to appoint another lawyer. I don't think you really want to represent yourself. And I think I'm in a position to continue to  direct Attorney Jayaraman to represent you. I don't see good cause.

N.T. 12/2/2019, at 37-39.

The subject was revisited briefly during trial. Appellant asked to be able to make a record on the issues he had raised regarding his appointed counsel, who had chosen not to cross-examine the government's principal identification eye-witness.  The trial court stated that

> So it seems to me you're going to have to wait until your 2255 and wait until the verdict to raise issues challenging how your lawyers are handling the case and handling the competency of your lawyers.

N.T. 12/10/2019, at 7.

    1.    *The trial court erred in refusing to determine the reasons for appellant's request for substitute counsel.*

The trial court erred in assuming that the appellant had no good reason to request substitution of counsel when the issue was raised on the record one week prior to trial. As a practical matter, the trial court concluded that there was no "good cause" without conducting an adequate or reasoned inquiry. The trial court failed to meet its obligation to conduct "at least some inquiry as to the reason for the defendant's dissatisfaction with his existing attorney." *United States v.*

*Welty*, 674 F.2d 185, 187-188, (3d Cir. 1982) (collecting cases); see also,

*United States v. Senke*, 986 F.3d 300, 309-310, (3d Cir. 2021 ) (good

cause can be "a conflict of interest, a complete breakdown of

communication, or an irreconcilable conflict with the attorney.")

Here, the trial court avoided all inquiry, simply assumed that the

appellant's complaints were meritless, and moved on. When the

appellant tried to explain prior to trial why he had lost faith in his

appointed counsel, the trial judge flatly stated, without inquiry, "I don't

believe that's what happened." N.T. 11/2/2019, at 14. Later the trial

court explained that "You take it up on appeal." *Id.*, at 38. Finally, the

trial court stated during trial that

> So it seems to me you're going to have to wait until your 2255 and
> wait until the verdict to raise issues challenging how your lawyers
> are handling the case and handling the competency of your
> lawyers.

N.T. 12/10/2019, at 7. Whatever "at least some inquiry" requires, it

most assuredly required more inquiry than was made here. There was

no inquiry into whether there had arisen "a complete breakdown of

communication, or an irreconcilable conflict with the attorney." It was

error, and an abuse of discretion, to put off until post-trial review

whether there was good cause to replace appointed trial counsel. This violation of the Sixth Amendment is not subject to prejudice inquiry. See *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006)

    2.    *The trial court erred in refusing to permit appellant to represent himself.*

The Sixth Amendment guarantees a criminal defendant the right to self-representation if he "knowingly and intelligently" waives his concomitant Sixth Amendment right to counsel. *United States v. Taylor*, 21 F.4th 94, 97, (3rd Cir. 2021), citing *Faretta v. California*, 422 U.S. 806, 835 (1975). The issue is not whether the defendant has a sufficient familiarity with the Rules of Evidence or whether he might make meritless legal arguments. *Taylor*, supra:

> We acknowledge that Taylor was a difficult defendant, questioning the District Court's jurisdiction and pressing meritless legal arguments in pro se filings. Nonetheless, because the District Court denied Taylor's request without completing the requisite inquiry, we will vacate Taylor's conviction and remand for a new trial.

*United States v. Taylor*, 21 F.4th 97. Rather, the trial court is required to assess whether the defendant understands the risks he is assuming by proceeding pro se under the circumstances. The right to self-

representation is a right, not a privilege, because "the Constitution does not force a lawyer upon a defendant," *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942); *Faretta v. California*, 422 U.S. 806, 820 (1975). As the Supreme Court stated forcefully in *Faretta*, " The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." 422 U.S. 819.

In *Taylor*, this Court reviewed these rules, stating that before a defendant may exercise his right to self-representation, he must knowingly, intelligently, and voluntarily waive his right to counsel, citing *Buhl v. Cooksey,* 233 F.3d 783, 789 (3d Cir. 2000). The District Court, therefore, is obligated to conduct a "sufficiently penetrating inquiry to satisfy itself that the defendant's waiver of counsel is knowing and understanding as well as voluntary." *United States v. Peppers*, 302 F.3d 120, 130-31 (3d Cir. 2002). During this inquiry, the district court must ascertain whether the defendant

> (1) has clearly and unequivocally asserted his desire to represent himself; (2) understands the nature of the charges, the range of possible punishments, potential defenses, technical problems that [he] may encounter, and any other factors important to a general

understanding of the risks involved; and (3) is competent to stand trial.

*United States v. Taylor*, 21 F.4th 94, 100. The trial court here chose a different path, inquiring principally whether the defendant would know enough to do a good job representing himself.

After he was told that he would have to proceed with his appointed lawyer or by himself, he "clearly and unequivocally" stated his desire "to go by myself." N.T. 11/2/2019, at 13. The district court was able to get the defendant to admit that "I've never wanted to represent myself." *Id.*, at 37. But the district court plainly knew that the appellant was asking first for substitute counsel, and if that would not be granted, then he asked to represent himself. Appellant had completed a sufficient colloquy pursuant to *Faretta v. California*, 422 U.S. 806, 820 (1975), and had demonstrated that he was making a knowing, understanding and voluntary choice to represent himself. The district court committed structural error in refusing to permit self-representation, and so a new trial is mandated.

**3.    THE DISTRICT COURT ABUSED ITS DISCRETION IN ADMITTING APPELLANT'S PRETRIAL TEXT MESSAGES TO A WITNESS BECAUSE THE PROBATIVE VALUE OF THOSE COMMUNICATIONS WAS SUBSTANTIALLY OUTWEIGHED BY THEIR PREJUDICIAL EFFECT, RESULTING IN PREJUDICIAL ERROR WARRANTING THE GRANT OF A NEW TRIAL.**

<u>Standard of review:</u> The Court reviews the district court's decision to admit the evidence for abuse of discretion. *United States v. Bailey*, 840 F.3d 99, 126-127 (3d Cir. 2016).

<u>Discussion:</u> The text messages from appellant to his former girlfriend, called at trial as a government witness, were dangerously prejudicial evidence because the admission of these communications invited anti-Muslim bias, and that danger greatly, and substantially, outweighed any proffered probative value.

The communications in question were text messages sent to the witness, Ms. Waller, by the appellant. The government introduced two particularly prejudicial exhibits as Exhibits 28-C and 28-D. The first, Exhibit 28-C, was a text message attributed to defendant, read into the record as follows:

> When I first read the statement you gave I thought she was scared and did what she thought was best, no blame. But when I seen the photos of you taking my stuff to the station and then for you to lie about it -- no, they didn't get my stuff from your house,

34

you took it down there -- I thought why would you want to betray me in such a matter? Why would you tell on me? We used to have a running joke that I would not do anything to make you kill me because I didn't want to see you in prison. Why do you want to see me in prison? I would have did yours and my time. Your betrayal is worse than death. I (sic) your goal was to take me away from my kids and have me spend my last days in prison, congrats, you succeeded. Shame on you. The fact that you lied about means you know you're wrong.

N.T. 12/10/2019, 268-269. Ms. Waller then testified that this message made her "Uncomfortable, fearful." *Id.*, at 270. There was no explanation offered for why it made her fearful.

Secondly, the government introduced Exhibit 28-D, a text message attributed to appellant, sent to Ms. Waller from an account at the FDC, which read as follows:

Surah 7:178, 'Whomsoever Allah guides, he is the guided one, and whomsoever he sends astray, then those, they are the losers.' Surah 3:30, 'On the day when every person will be confronted with all the good he has done and all the evil he has done, he will wish that there were great distance between him and his evil.' You think you're winning now, but not for long. If you knew what I know, you would laugh less and cry more."

I just want you to know I forgive you, H-O-M-M,"

N.T. 12/10/2019, 271-272. Ms. Waller then testified that the message made her "fearful." *Id.*, at 272. There was no explanation offered for

why it made her fearful.

The "laugh less, cry more" comment on which the Government relies so heavily is an iteration of the Hadith or admonitions of the Prophet Muhammad, contained in a Chapter on honour, prestige or self-respect:

O followers of Muhammad! If you but knew what I know, you would laugh less and weep more!

https://quranx.com/hadith/Bukhari/USC-MSA/Volume-7/Book-62/Hadith-148/ (last accessed May 17, 2023) Sahih al-Bukhari is a collection of hadith compiled by Imam Muhammad al-Bukhari (d. 256 AH/870 AD) (rahimahullah). His collection is recognized by the overwhelming majority of the Muslim world to be the most authentic collection of reports of the Sunnah of the Prophet Muhammad. It contains over 7500 hadith (with repetitions) in 97 books. The translation provided here is by Dr. M. Muhsin Khan.

The Muslim commentary here had no purpose other than to prejudice Mr. Carter. Exhibit 28D served no "proper purpose," but whatever purpose it may have served was substantially outweighed by its prejudical effect: the "laugh less and weep more" comments were not

probative of whether appellant committed the charged robberies and/or whether he was conscious of his own guilt.

### 1.    *The Rule 404(b) analysis.*

Rule 404(b) is a rule of exclusion, meaning that it excludes evidence unless the proponent can demonstrate its admissibility, but it is also "inclusive" in that it does not limit the non-propensity purposes for which evidence can be admitted. *United States v. Repak*, 852 F.3d 230, 241 (3d Cir. 2017). The Rule requires 4 analytic steps: (1) the other-acts evidence must be proffered for a non-propensity purpose; (2) that evidence must be relevant to the identified non-propensity purpose; (3) its probative value must not be substantially outweighed by its potential for causing unfair prejudice to the defendant; and (4) if requested, the other-acts evidence must be accompanied by a limiting instruction. *United States v. Repak*, 852 F.3d 241, citing *Huddleston v. United States*, 485 U.S. 681, 691 (1988).

Exhibits 28-C and 28-D are offered to show consciousness of guilt. Exhibit 28-C includes the statement "why would you want to betray me in such a matter? Why would you tell on me? . . . The fact that you lied

about means you know you're wrong." This is offered for an arguably proper purpose, consciousness of guilt, and arguably relevant to that purpose. But Exhibit 28-D, with its comment that "If you knew what I know, you would laugh less and cry more," is not offered for any proper purpose, and is not relevant to any such "proper purpose."

Whatever marginal probative value these 2 statements support, that probative value is substantially outweighed by the risk of unfair prejudice. The existence of pervasive racial and religious prejudice against Muslims in contemporary society is a sad but widely acknowledged fact. See, e.g., *Mack v. Yost*, 63 F.4th 211 (3d Cir. 2023) (discussing history of discrimination against Muslim inmate at FCI Loretto); see generally, Lajevardi, N*., The Media Matters: Muslim American Portrayals and the Effects on Mass Attitudes*, 83 Journal of Politics 1060 (July, 2021) (Collecting data, and reporting that "negative attitudes toward Muslim Americans are pervasive" and "rooted in old-fashioned racist beliefs.")

When determining whether the probative value of evidence is substantially outweighed by the unfair prejudice its admission will

produce, "the [district] court must evaluate . . . whether the evidence is sufficiently probative, such that its probative value is not outweighed by [its] inherently prejudicial nature." *United States v. Caldwell*, 760 F.3d 267, 277 (3d Cir. 2014). Specifically, when making this determination, [district] courts should "appraise the genuine need for the challenged evidence" and then balance that need against the risk of prejudice. *United States v. Claxton*, 766 F.3d 280, 302 (3d Cir. 2014). The need for evidence must be considered "in view of the contested issues and other evidence available to the prosecution, and the strength of the evidence in proving the issue.

 2. *The District Court abused its discretion in assessing the prejudicial effect of these communications.*

 The Court of Appeals reviews the district court's application of Rule 404(b)'s prejudice inquiry for abuse of discretion. *United States v. Repak*, 852 F.3d 240. The District Court manifestly abused its discretion here when it failed to conduct a meaningful balancing of the proffered probative value and the apparent prejudicial effect of the messages.

 The district court addressed this issue in its Order of December 5.

2019, DDE 56, at 2, 30a. The trial court identifies the likely prejudice
from the apparent religious references, but then fails to conduct any
meaningful balancing. Rather the Court indicates that it will "avoid
this issue" by asking potential jurors whether "any jurors would be
biased based on Carter's religion. The trial court in fact read such a
question during voir dire:

> THE COURT: Members of the jury, is there anything about the
> race, religion, background, or appearance of the defendant or
> anything that will make it difficult for you to be a fair and
> impartial juror in this case? I see or hear no response.

N.T. 12/9/2019, at 54. However, during voir dire, there was no way for
potential jurors to know that the appellant was a Muslim. One is left to
wonder, how exactly was a prospective juror who was inclined to be
prejudiced against Muslims supposed to know that Mr. Carter was a
Muslim? How could such a question "avoid" racial prejudice when the
potentially prejudiced juror had no idea that they were about to judge a
Muslim man?

The District Court abused its discretion when it failed to conduct
any meaningful balancing of the need for the challenged messages and
the potential for substantial prejudice. Accordingly, a new trial is

required.

## **CONCLUSION**

The conviction must be set aside, and remanded for a new trial.

At that trial, neither evidence derived from an unlawful arrest nor Mr.

Carter's text messages may be admitted against him.

Respectfully submitted,

Dated:  May 22, 2023          By: *Joseph P. Green, Jr.*

*PA Atty I. D. No. 32604*
*18 South New Street*
*West Chester, PA  19382*
   *Telephone:  (610) 692-0500*
   *josephpgreen@gmail.com*

Counsel for appellant Carter

# REQUIRED CERTIFICATIONS

A.    Bar Membership. I certify that the attorney whose name and signature appear on this brief is a member of the Bar of this Court.

B. Type-Volume. This brief was prepared in a 14-point Century Schoolbook, a proportionally spaced face which includes serifs. Pursuant to Fed.R.App.P. 32(a)(7)(C), I certify, based on the word-counting function of my word processing system (WordPerfect 2016), that this brief complies with the type-volume limitations of Rule 32(a)(7)(B), in that the brief contains no more than 13,000 words, that is, 8254 words, including footnotes.

C.    Electronic Filing. I certify pursuant to LAR 31.1(c) that the text of the electronically filed version of this brief is identical to the text in the paper copies of the brief as filed with the Clerk. The anti-virus program Bitdefender, with current updates, has been run against the electronic (PDF) version of this brief before submitting it to this Court's CM/ECF system, and no virus was detected.

Dated:  May 22, 2023          By: *Joseph P. Green, Jr.*

# CERTIFICATE OF SERVICE

On May 22, 2023, I served a copy of the foregoing brief on counsel for the United States, via ECF filing and first class mail (within 3 days thereafter), addressed to:

Kelly M. Harrell, Esquire
U.S. Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
kelly.harrell@usdoj.gov
Dated:  May 22, 2023          By: *Joseph P. Green, Jr.*

**Docket No. 22-3395**

*IN THE UNITED STATES COURT OF APPEALS*
*FOR THE THIRD CIRCUIT*

_____

**UNITED STATES OF AMERICA**

**v.**

**DARIUS CARTER,**

**Defendant-Appellant**

_____

On Appeal from Judgment of Conviction and Sentence in the
United States District Court for the Eastern District of Pennsylvania
No.  2:19-cr-00078-JS (Sanchez, C.J.)

_____

**APPENDIX FOR APPELLANT CARTER**

JOSEPH P. GREEN, JR.

*PA Atty I. D. No. 32604*
*18 South New Street*
*West Chester, PA  19382*
*Telephone:  (610) 692-0500*
*josephpgreen@gmail.com*

Counsel for appellant Carter

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **No. 2:19-CR000078-001** |
| | : | |
| **DARIUS CARTER** | : | |

## NOTICE OF APPEAL

Notice is hereby given that Darius Carter, defendant in the above named case, hereby appeals to the United States Court of Appeals for the Third Circuit from the final judgment of sentence entered in this action on the 8th day of December, 2022.

Respectfully submitted,

By: *s/ Joseph P. Green, Jr.*

*PA Atty I. D. No. 32604*
*18 South New Street*
*West Chester, PA  19382*
*Telephone:  (610) 692-0500*
*josephpgreen@gmail.com*

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

### Eastern District of Pennsylvania

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| DARIUS CARTER | Case Number: DPAE2:19-CR000078-001 |
| | USM Number: 69869-066 |
| | Joseph P. Green, Jr., Esquire |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1 and 2
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:1951(a) | Interference with interstate commerce by robbery | 10/18/2018 | 1 |
| 18:1951(a) | Interference with interstate commerce by robbery | 10/23/2018 | 2 |

   The defendant is sentenced as provided in pages 2 through _____7_____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/8/2022
Date of Imposition of Judgment

/s/Juan R. Sánchez
Signature of Judge

Juan R. Sánchez, Chief US District Judge
Name and Title of Judge

12/9/2022
Date

**2a**

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __7__

DEFENDANT:   DARIUS CARTER
CASE NUMBER:   DPAE2:19-CR000078-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a
total term of:
134 months on each of Counts 1 and 2, all such terms to run concurrently, to produce a total term of 134
months

☑ The court makes the following recommendations to the Bureau of Prisons:
   Defendant is to participate in the Inmate Financial Responsibility Program and make a minimum
   payments in the amount of $25 per quarter.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

   ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before 12:00 p.m. on_____ .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**3a**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___7___

DEFENDANT:   DARIUS CARTER
CASE NUMBER:   DPAE2:19-CR000078-001

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Three years. This includes three year terms on each of Counts 1 and 2, all such terms to run concurrently.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

**4a**

| | Judgment—Page | 4 | of | 7 |
|---|---|---|---|---|

DEFENDANT:  DARIUS CARTER
CASE NUMBER:  DPAE2:19-CR000078-001

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision.  These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

DEFENDANT:  DARIUS CARTER
CASE NUMBER:  DPAE2:19-CR000078-001

# SPECIAL CONDITIONS OF SUPERVISION

The defendant shall refrain from the illegal possession and/or use of drugs and shall submit to urinalysis or other forms of testing to ensure compliance.  It is further ordered that the defendant shall participate in drug treatment and abide by the rules of any such program until satisfactorily discharged based on the recommendation by the Probation Office and with the Court approval.

The defendant shall participate in a mental health program for evaluation and/or treatment and abide by the rules of any such program until satisfactorily discharged based on the recommendation by the Probation Office and with the Court approval.

The defendant shall participate in a program at the direction of the probation officer aimed at obtaining a GED, learning a vocation, or improving the defendant's literacy, education level, or employment skills in order to develop or improve skills needed to obtain and maintain gainful employment. The defendant shall remain in any recommended program until completed or until such time as the defendant is released from attendance by the probation officer and Court approval.

The defendant shall provide the U.S. Probation Office with full disclosure of his financial records to include yearly income tax returns upon the request of the U.S. Probation Office. The defendant shall cooperate with the probation officer in the investigation of his financial dealings and shall provide truthful monthly statements of his income.

The defendant is prohibited from incurring any new credit charges or opening additional lines of credit without the approval of the probation officer, unless the defendant is in compliance with a payment schedule for any fine or restitution obligation. The defendant shall not encumber or liquidate interest in any assets unless it is in direct service of the fine or restitution obligation or otherwise has the express approval of the Court.

It is further ordered that the defendant shall make restitution in the amount of $1,135. Payments should be made payable to Clerk, U.S. District Court, for distribution to the following victims:
Victim   Loss Amount  Address for Restitution

Boost Mobile  $625  Boost Mobile
    2740 North 5th Street
    Philadelphia, PA 19133

Metro PCS  $510  Metro PCS
    2704 North 5th Street
    Philadelphia, PA 19133

The restitution is due immediately. It is recommended that the defendant participate in the Bureau of Prisons Inmate Financial Responsibility Program and provide a minimum payment of $25 per quarter towards restitution.  In the event the entire restitution is not paid prior to the commencement of supervision, the defendant shall satisfy the amount due in monthly installments of not less than $25, to commence 60 days after release from confinement.

The defendant shall notify the United States Attorney for this district within 30 days of any change of mailing address or residence that occurs while any portion of the restitution remains unpaid.

The Court finds that the defendant does not have the ability to pay a fine. The Court will waive the fine in this case.
It is further ordered that the defendant shall pay to the United States a total special assessment of $200, which shall be due immediately.

**6a**

AO 245B (Rev. 09/19)     Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page __6__ of __7__

DEFENDANT: DARIUS CARTER
CASE NUMBER: DPAE2:19-CR000078-001

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 200.00 | $ 1,135.00 | $ 0.00 | $ 0.00 | $ 0.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Boost Mobile | $625.00 | $625.00 | 100% |
| 2740 North 5th Street | | | |
| Philadelphia, PA 19133 | | | |
| | | | |
| Metro PCS | $510.00 | $510.00 | 100% |
| 2704 North 5th Street | | | |
| Philadelphia, PA 19133 | | | |

| TOTALS | $ 1,135.00 | $ 1,135.00 |
|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☑ the interest requirement is waived for the   ☐ fine   ☑ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

7a

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 6 — Schedule of Payments

DEFENDANT: DARIUS CARTER
CASE NUMBER: DPAE2:19-CR000078-001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $ __200.00__  due immediately, balance due

    ☐  not later than _____ , or
    ☑  in accordance with  ☐  C,  ☐  D,  ☐  E, or  ☑  F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☑  Special instructions regarding the payment of criminal monetary penalties:
    Defendant is to participate in the Inmate Financial Responsibility program and pay $25 per quarter towards the
    special assessment. In the event the entire amount due is not paid prior to the commencement of supervision, the
    defendant shall pay satisfy the amount due in monthly installments of not less than $25, to commence 60 days
    after release from confinement.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

Case Number
Defendant and Co-Defendant Names                                       Joint and Several              Corresponding Payee,
*(including defendant number)*              Total Amount                     Amount                       if appropriate

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**8a**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 19-78 |
| | : | |
| DARIUS CARTER | : | |

## ORDER

AND NOW, this 25th day of November, 2019, upon consideration of Darius Carter's Motion to Suppress, the Government's Opposition, the testimony and evidence presented at the June 17, 2019, suppression hearing, and the parties' supplemental briefs, it is ORDERED the Motion (Document 19) is DENIED. A memorandum opinion will follow.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.

9a

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 19-78 |
| | : | |
| DARIUS CARTER | : | |

**MEMORANDUM**

**Juan R. Sánchez, C.J.**                                                                 **November 26, 2019**

Defendant Darius Carter is accused of robbing two cell phone stores. He moves to suppress evidence the police collected as a result of his allegedly unconstitutional arrest. He also argues police violated his right against self-incrimination under *Miranda* and his due process rights by using a suggestive photo array. Because none of Carter's rights were violated, the Court denies Carter's motion to suppress.

**BACKGROUND**

On October 18, 2018, two men robbed a Boost Mobile store in North Philadelphia. A police bulletin described one of the robbers as a black man in his twenties who was approximately five feet nine inches tall. Gov't Hr'g Ex. 5 at 1. The bulletin also said this robber was wearing "black pants with stripes on the side, [a] dark navy blue hoody, black sneakers, gloves, [a] mask, [and a] blue school book bag." *Id.* The bulletin explained this robber was carrying a black semi-automatic handgun. *Id.* In addition, the bulletin noted both robbers fled west then north after committing the robbery. *Id.*; *see also* Gov't Ex. 1 (map of the area). After the robbery, police recovered security video from inside the Boost Mobile store. The video showed that the robber carrying the gun was wearing a navy Adidas jacket and glasses. Gov't Hr'g Ex. 4a. A picture of the robber taken from the surveillance video was included in the police bulletin. Gov't Hr'g Ex. 5 at 1.

1

On October 23, 2018, five days after the Boost Mobile robbery, a man robbed a second cell phone store, a MetroPCS store, on the same block as the Boost Mobile store. N.K., the manager of the MetroPCS store, witnessed this robbery. N.K. described the robber as a black man who weighed approximately 150 pounds wearing "[a] blue Adidas jacket, blue pants, [and a] dark bandana on [his] face." Hr'g Tr. 20-21. N.K. told the police the robber was armed. Gov't Hr'g Ex. 3. He also told the police he saw the robber take off his mask and flee down Fifth Street in the direction of Lehigh Street. *Id.*; Hr'g Tr. 148, 150-51; *see also* Gov't Hr'g Ex. 1 (map). Both cell phone stores were on Fifth Street between Summerset and Lehigh streets. *Id.*; Hr'g Tr. 35-36.

While MetroPCS did not have security footage of the robbery, the police collected security videos from three nearby buildings: a gas station, a grocery store, and a housing complex. Hr'g Tr. 25, 82-83. The gas station is on the corner of Fifth and Lehigh, which is the direction N.K. saw the robber flee. Hr'g Tr. 18; Gov't Hr'g Ex. 3. The grocery store is on the corner of Summerset Street, one block north of the MetroPCS store, and Reese Street, one block west. Hr'g Tr. 35; Gov't Hr'g Ex. 1. The housing complex is on Summerset Street and Eighth Street, a few blocks west of the MetroPCS store. Hr'g Tr. 31; Gov't Hr'g Ex. 1.

The police believed videos from these three locations showed the robber both going to the MetroPCS store and leaving from the MetroPCS store.[1] The videos show a black man wearing a navy Adidas jacket, a backpack, and dark pants with white stripes. Gov't Hr'g Ex. 4b. The cameras first capture the man walking east past the housing complex on Eighth and Summerset. *Id.* at 0:14-0:31. Next, they show the man turning south on Reese street near the grocery store. *Id.* at 0:35-

---

[1] Carter disputes whether the person in the video is the robber. The Court need not decide whether the person in the video was the robber. The Court need only decide whether the police *reasonably believed* the person in the video was the robber. As explained in the discussion section below, the Court finds the police reasonably believed the person in the video was the robber.

2

0:46. Then they show the man using an alley near the gas station to go from Reese Street to the block on Fifth Street with the MetroPCS store. *Id.* 1:11-1:30. A short time later, the cameras capture what appears to be the same man running away from the direction of the MetroPCS store. *Id.* at 6:05. He runs toward Lehigh Street but turns west into the alley near the gas station. *Id.* He runs through the alley to Reese Street. *Id.* at 6:11-6:18. Finally, he is captured running north on Reese Street and turning West onto Summerset Street near the grocery store. *Id.* at 6:32-6:43. These videos suggest the robber came from and fled to a location northwest of the cell phone store.

Three days after the MetroPCS robbery, on October 26, 2018, Police Officer Thomas Bellon saw Carter on Cambria Street near Thirteenth Street. Hr'g Tr. 53. This was less than a mile away, or about a fifteen-minute walk, from where the robberies occurred. Def's Mot. to Suppress Ex. C.; Gov't Hr'g Ex. 1. It was also about four to eight blocks west and a couple blocks north of the housing complex where Officer Bellon had recovered the video of the man he believed to be the robber. *Id.*; Hr'g Tr. 52. Thirteenth and Cambria was also a high crime area. Hr'g Tr. 51, 57. When Officer Bellon saw Carter, he was wearing a navy Adidas jacket, black Adidas pants with white stripes, black sneakers, and glasses. Gov't Hr'g Ex. 7.

When he noticed Carter, Officer Bellon suspected Carter might be the person who robbed the cell phone stores. Officer Bellon was the officer who had initially responded to the MetroPCS robbery and spoken to the witness, N.K. Hr'g Tr. 19-20. Officer Bellon was also the Officer who initially found and watched the security footage from the three buildings near the MetroPCS store.[2]

---

[2] Carter argues Officer Bellon's testimony on this point is not credible. According to Carter, the report Officer Bellon filed after he stopped Carter undermines Officer Bellon's testimony because it only mentions the video from the housing complex. Hr'g Tr. 98. Therefore, Carter argues, Officer Bellon must have only seen this one video. The Court finds all of Officer Bellon's testimony credible, including his testimony on this point. Officer Bellon credibly explained that he included the housing complex video in the report because he had recovered it himself, and he did not include other videos in the report because he merely viewed those videos and flagged them

Hr'g Tr. 27-30. He explained that the versions of the videos he saw when he went to each of these three locations were clearer than the videos presented to the Court at the suppression hearing. Hr'g Tr. 55-57. In the clearer version of the videos, Officer Bellon could see that the man in the video was wearing glasses. *Id.* In addition to watching these videos and getting a description from N.K., Officer Bellon also saw the police bulletin from the earlier robbery of the Boost Mobile store. Hr'g Tr. 45-46. This bulletin had a description and a picture of the men who robbed the Boost Mobile store. Gov't Hr'g Ex. 5.

When he spotted Carter, Officer Bellon and his partner Officer Rosa followed Carter into a small convenience store. Both Officers filmed their subsequent interaction with Carter on their body cameras. Video from the Officers' cameras shows Carter with his hands in his pockets when the Officers approached him. Gov't Hr'g Ex. 6 at 0:40-0:47; Gov't Hr'g Ex. 7 at 0:41-47. It also shows Carter turning to his side when he sees the officers. *Id.* (both cites). The Officers handcuffed Carter almost immediately. Gov't Hr'g Ex. 6 at 0:48-1:07. Soon after the Officers approached Carter, he asked them why they were singling him out, but the Officers told him they would explain later. *Id.* at 0:44-1:53. While the Officers were patting him down, he asked "[are] you all looking for somebody or something? Do I fit a description or something?" *Id.* at 1:30-1:34.

After the Officers frisked Carter, they asked him his name. Carter gave the Officers the fake name of James or "Jimmy" Smith. *Id.* at 2:29-2:34, 4:34-4:39. The Officers asked if Carter had any ID and he told them he had left his ID at home. *Id.* at 2:36-2:40. While the Officers were speaking with Carter, they called for backup. The Officers had been on foot, so they did not have

---

for the detectives to recover later. Hr'g Tr. 101-02. Officer Bellon also testified extensively regarding his experience locating and viewing the videos at all three locations. *See generally* Hr'g Tr. 26-45 (Officer Bellon's direct testimony about the videos). In addition, nothing in Officer Bellon's report indicates the housing video is the only video available. *See generally* Gov't Hr'g Ex. 8 (the report).

4

a police car. Hr'g Tr. 64-65. The backup officers had a police car with a Mobile Data Terminal. This Terminal lets the police look up a person's arrest record, and it also shows if a person has an I.D., like a driver's license. Hr'g Tr. 65. About six minutes after the officers began talking to Carter, they moved him to the police car. Gov't Hr'g Ex. 6 at 6:57-7:08. Once Carter was in the car, Officer Rosa used the Terminal to look up the name and birthday Carter provided. Hr'g Tr. 66. Officer Rosa found no records for a James Smith with the birthday Carter gave him. *Id.* This meant that either "James Smith" had no arrests and no I.D. or "James Smith" was a fake name.

After the Officers could not identify Carter using the Terminal, the Officers decided to bring Carter to the police station. The backup officers took Carter to the station, which was about a five-minute drive from the store where they found Carter. Hr'g Tr. 70. On the ride to the station, Carter told the police officers he had lied about his name and he had an outstanding warrant. Hr'g Tr. 67. When they were at the station, the police discovered Carter's real name and found his outstanding warrant. Gov't Hr'g Ex. 10 at 3. They then transferred him to the Kintock Center, a detention facility. *Id.* at 3-4.

After finding Carter, the police continued to investigate the robberies. They got a warrant to search Carter's room at the Kintock Center. *Id.* During their search of his room, they recovered the clothing he was wearing when he was arrested. Def's Mot. to Suppress Ex. A at 4. They also searched his last known address, which was a house owned by his ex-girlfriend, B.W. While that search did not turn up any evidence, B.W. later came to the police station with some of Carter's belongings. Those belongings included a package for a BB gun designed to look like a handgun. Gov't Hr'g Ex. 15 at 7. The package was addressed to Carter and it was sent on September 19, 2018, about a month before the robberies. *Id.*

5

The police also used Carter's picture in a photo array that they showed one witness at each of the two robberies. Gov't Hr'g Ex. 10 at 3. While the Boost Mobile witness could not identify anyone in the photo lineup, N.K., the MetroPCS witness, identified Carter. *Id.* Detective Dinezza, who was not involved in the investigation and did not know who the suspect was, administered the photo array shown to N.K. *Id.*; *see also* Hr'g Tr. 125. Detective Dinezza showed N.K. each of the pictures in the photo array one by one. Hr'g Tr. 127-28. He then showed N.K. each picture a second time and asked if N.K. recognized each picture. *Id.* N.K. said he recognized Carter's picture and he was 75% sure Carter was the robber. Gov't Hr'g Ex. 11 at 2. He later told police he "definitely chose the right guy . . . but that the picture was a little bit older." Gov't Hr'g Ex. 13 at 1. The picture was actually taken in October 2017, a year before the robberies. Gov't Hr'g Ex. 10 at 4.

On January 31, 2019, the Government filed an indictment charging Carter with two counts of robbery. After he was indicted, Carter moved to suppress the statements he made to the police, the clothing taken from his room, the box from the BB gun, and N.K.'s identification of him as the robber. The Court issued an Order denying Carter's motion on November 25, 2019. This memorandum explains the Court's reasons for denying Carter's Motion.

**DISCUSSION**

Carter makes three arguments in favor of suppressing the evidence against him. First, he argues the police violated the Fourth Amendment when they seized him at the convenience store. Second, he argues his statements to police should be suppressed because he was not given *Miranda* warnings. Third, he argues the photo array shown to the witnesses was unfair. The Court holds: (1) the officers did not violate the Fourth Amendment when they seized Carter; (2) Carter's statements to the police should not be suppressed because the statements were not part of a police

interrogation; and (3) Carter's picture was not unfairly singled out in the photo array.[3] The Court therefore denies Carter's motion to suppress.

### A. Carter's Seizure

The police had reasonable suspicion to stop Carter when they approached him in the convenience store, and this stop was not a de facto arrest.

The Fourth Amendment prohibits unreasonable seizures, but the police may seize or arrest a suspect if they do so reasonably. Police may seize and detain a suspect for a brief *Terry* stop when they have reasonable suspicion the suspect "was involved in or is wanted in connection with a completed felony." *United States v. Hensley*, 469 U.S. 221, 229 (1985). The police can also arrest a suspect when they have probable cause to believe "that an offense has been or is being committed by the person to be arrested." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016). With limited exceptions, when the police violate the Fourth Amendment, the Court must suppress the evidence they later uncover as "fruit of the poisonous tree." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).

The Court will address Carter's seizure in three steps. First, the Court will determine whether Carter's encounter with police was a *Terry* stop or a de facto arrest. Second, the Court will decide whether the police had the appropriate degree of suspicion to support this seizure. Third, the Court will discuss whether the evidence later collected by the police must be suppressed under the "fruit of the poisonous tree" doctrine.

The Officer's stop of Carter was a *Terry* stop and not a de facto arrest. While there can be "difficult line-drawing problems in distinguishing an investigative stop from a de facto arrest," the

---

[3] In his brief, Carter argued that the search warrant the police used to search his home contained material misstatements and omissions. During the suppression hearing, Carter withdrew this portion of his motion. Hr'g Tr. 114, 120-21. The Court will therefore not address this argument.

touchstone is whether the defendant is detained longer than necessary for the police to conduct their investigation. *United States v. Sharpe*, 470 U.S. 675, 685 (1985). In other words, a *Terry* stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *accord Sharpe*, 470 U.S. at 682 (quoting *Terry*).

Carter argues his stop was a de facto arrest because he was handcuffed, put in a police car, and transported to the police station. The Court finds none of these elements transformed the *Terry* stop into a de facto arrest because the Officers acted reasonably and diligently in conducting their investigation.

The Officers reasonably handcuffed Carter as part of the *Terry* stop. The Third Circuit has held that handcuffing a defendant does not turn a *Terry* stop into an arrest. *United States v. Johnson*, 592 F.3d 442, 448 (3d Cir. 2010) ("Nor does placing a suspect in handcuffs while securing a location or conducting an investigation automatically transform an otherwise-valid *Terry* stop into a full-blown arrest."). In *Johnson*, the Third Circuit explained that handcuffing a defendant during a *Terry* stop is appropriate when the police do so "to ensure that the scene [i]s secure." *Id.*

Here, Officers handcuffed Carter to secure the scene and preserve officer safety as part of the *Terry* stop. The Officers had reason to believe Carter carried a weapon when they handcuffed him. At the time, they thought Carter had committed two armed robberies. When they approached Carter, he had his hands in his pockets while turning one side away from them. Their suspicion that Carter was an armed robber combined with Carter's behavior convinced the police Carter might have a weapon. Because the Officers reasonably handcuffed Carter for their safety as part of the *Terry* stop, this action did not turn the stop into an arrest. *Johnson*, 592 F.3d at 448.

8

Similarly, the Officers' decision to put Carter in the police car did not transform the stop into an arrest. During a *Terry* stop, it is permissible for the police to take reasonable steps to determine a suspect's identity and to secure the situation. The Supreme Court has explained that police have "the ability to briefly stop that person [the suspect], ask questions, or check identification in the absence of probable cause." *United States v. Hensley*, 469 U.S. 221, 229 (1985); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, *in order to determine his identity* or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (emphasis added)). In *Terry*, the Supreme Court emphasized that police may take reasonable steps to prevent violence during an investigative stop. *Terry* 392 U.S. at 24 (1968) ("[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. . . . [It is] clearly unreasonable to deny the officer[s] the power to take necessary measures . . . to neutralize the threat of physical harm.").

The Officers' decision to put Carter in the police car was permissible as part of their efforts investigate Carter's identity and to secure the area. The police car had the Mobile Data Terminal, which was the best way to check Carter's identity. Hr'g Tr. 65-66. Since Officer Rosa had to be in the front seat of the car to use the terminal, it was reasonable for the Officers to put Carter in the back seat. This way, Officer Rosa could easily ask Carter for the information Officer Rosa needed to look up the name "James Smith" in the Terminal. The police officers were also worried about their safety. While they had already frisked Carter for weapons, there were a number of pedestrians on the sidewalk who could have interfered with the police encounter. Gov't Hr'g Ex. 6 at 7:00-8:04; Hr'g Tr. 105. Officer Bellon credibly testified that, because of his previous experiences in

this neighborhood, he feared a confrontation on the street could cause bystanders to become unruly or violent. Hr'g Tr. 57-58. The Officers reasonably thought placing Carter in the car, instead of talking to him on the sidewalk, would minimize the risk that these nearby bystanders would intervene. Putting Carter in the police car was therefore a reasonable method to both investigate his identity and avoid possible harm to police officers.

The Officer's decision to take Carter to the police station also did not elevate the stop into an arrest. Transporting a defendant a short distance for identification purposes is not outside the scope of a *Terry* stop. *United States v. Foster*, 891 F.3d 93, 107 (3d Cir. 2018) (explaining that it was not unreasonable as part of a *Terry* stop "to transport [the defendant] the very short distance back to Branmar Plaza [so a police officer could identify him].").

The Officers reasonably transported Carter for five minutes to the police station to learn his identity.[4] The Officers suspected James "Jimmy" Smith was a fake name, but they needed to bring Carter to the station to confirm their suspicions. Carter argues that the police had no reason to suspect he was lying to them about his name. The Court disagrees. The police had a reason to be suspicious when no "James Smith" came up in the Mobile Data Terminal. There were only two ways to explain why this name did not come up. The first explanation was "James Smith" had never gotten any form of ID and never had any previous encounters with the police. The second explanation was "James Smith" was a fake name. Since Carter had told the police earlier that he

---

[4] Carter argues that the Officers did not bring Carter to the station to learn his identity, but instead to investigate the robberies. The Court finds the Officers were interested in determining Carter's identity, not questioning him about the robberies. Hr'g Tr. 66-67. There is no evidence that police ever questioned Carter about the robbery or that they intended to hold him for longer than it took to discover his identity. *See Id.* (Officer Bellon's testimony that he would have let Carter go as soon as he discovered Carter's real identity if Carter had not had an outstanding warrant). While the police may have intended to use Carter's identity in order to further their investigation of the robberies, discovering a suspect's identity is a permissible goal of a *Terry* stop. *See Adams*, 407 U.S. at 146 (it is often reasonable to use a *Terry* stop to determine a defendant's identity).

had an ID which he left at home, the Officers could rule out the first explanation. The Officers' suspicions were then confirmed when, on the way to the station, Carter told police he had lied about his name.[5]

Finally, the Court notes that the amount of time Carter spent detained did not turn his stop into an arrest. There is no bright-line rule regarding the length of time a defendant can be held during a *Terry* stop. *Sharpe*, 470 U.S. at 685 (1985) ("[O]ur cases impose no rigid time limitation on *Terry* stops . . . Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria."). Instead, a stop is permissible under *Terry* when "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686.

Carter was detained for less than twenty minutes before he told police he was lying about his name and he had an outstanding warrant. The officers held Carter for about thirteen minutes before sending him to the police station. Gov't Hr'g Ex. 6. They spent about six of the thirteen minutes waiting for backup. *Id.* This was a reasonable method of pursuing their investigation because they needed access to a police car with a Mobile Data Terminal to verify Carter's identity. They could only gain this access by calling for backup because they were on foot. After backup arrived, the Officers looked up Carter's false name in the Terminal. This was also a reasonable

---

[5] At this point the police had probable cause to arrest Carter for lying to a police officer about his identity, 18 Pa. Con. Stat. § 4914, and based on the outstanding warrant. Therefore, the Court need not explore whether Carter's subsequent detention in the station escalated into an arrest. *Cf. Sharpe*, 470 U.S. at 684 n. 4 (explaining that a defendant was arrested when "(1) the defendant was taken from a private dwelling; (2) he was transported unwillingly to the police station; and (3) he there was subjected to custodial interrogation resulting in a confession.") The Court also notes that Carter did not argue he was de facto arrested because of his treatment at the station; his argument about a de facto arrest focuses on the Officer's behavior before he arrived at the station.

method of trying to obtain Carter's identity. Only when this method failed did the Officers decide to transport Carter to the station, which was a five-minute drive away. Hr'g Tr. 70. In fact, the police would not have had to keep Carter longer than the time it took to put his name in the Terminal if Carter had not given a false name. Hr'g Tr. 66-67. The fact that Carter contributed to the delay weighs in favor of concluding that the stop did not escalate to an arrest. *See Sharpe*, 470 U.S. at 688 ("We reject the contention that a 20-minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains.").

Because the Court concludes the Officers executed a *Terry* stop, the Court will next address whether they had reasonable suspicion to do so. The Court holds that Officer Bellon had reasonable suspicion to stop Carter. A reasonable suspicion is a suspicion "grounded in specific and articulable facts." *Hensley*, 469 U.S. at 229. The Supreme Court has explained, "reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). However, a reasonable suspicion must be "more than more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* at 124.

In this case, Officer Bellon based his suspicion on at least five factors: (1) the videos he watched; (2) his discussion with N.K.; (3) the police bulletin he read; (4) his observations of Carter; and (5) Carter's location. These five factors combined were more than enough to justify the *Terry* stop. The Court will address each factor in turn.

First, Officer Bellon had seen video from three different locations of the person who he believed robbed the MetroPCS store. Carter argues that it was not reasonable for Officer Bellon to rely on this video because the video may not have depicted the robber. The Court finds it was reasonable for Officer Bellon to believe the video depicted the robber for several reasons: The

video depicted a person who was the same race and gender as the robber, wearing the same jacket as the robber, and wearing a backpack like the robber. The person in the video was walking towards the store that was robbed and, a few minutes later, running away from the store that was robbed. He was also running in the same direction the witness saw the robber flee. In addition, this video was taken around the time of the robbery from buildings near the robbery. While it is possible that two people with similar descriptions walked toward, and then ran away from, the MetroPCS store around the same time, it was reasonable for Officer Bellon to believe the person he saw in the video was the robber.

Second, Officer Bellon relied on the description he got from N.K. Information from a witness gives rise to reasonable suspicion when that information is reliable. *United States v. Brown*, 448 F.3d 239, 249 (3d Cir. 2006) ("[T]he Supreme Court has made clear that an informant's veracity, reliability, and basis of knowledge ... [are] highly relevant in determining the value of his report." (internal quotations omitted; second and third alterations in original)). Information is more reliable when it comes from a person who witnessed the crime. *Id.* at 249–50 (information is more reliable when "[t]he person providing the information has recently witnessed the alleged criminal activity"). In addition, information "given face to face is more reliable than [information given during] an anonymous telephone call." *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000). In this case, N.K. witnessed the robbery of the MetroPCS store shortly before speaking face to face with Officer Bellon. N.K.'s information was therefore a reliable basis for Officer Bellon's reasonable suspicion.

Third, Officer Bellon relied on the police bulletin from the earlier Boost Mobile robbery. The police may use a bulletin prepared by other officers as the basis for a *Terry* stop. In other words, "if a flyer or bulletin has been issued on the basis of articulable facts supporting a

reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification." *Hensley*, 469 U.S. at 232. Here, the bulletin was based on eye witness accounts from a Boost Mobile store employee and the security footage from the store.

Carter does not challenge the validity of the information in the bulletin regarding the Boost Mobile robbery. Instead, he argues the police should not have concluded that the man who robbed the MetroPCS store was one of the men who robbed the Boost Mobile store. The Court finds it was reasonable for the police to connect the two robberies: The two stores were on the same block and robbed within days of one another. After both robberies, the robbers were seen fleeing in roughly the same direction, and both robberies were committed by a person wearing the same jacket. While the Court notes it is possible that a second person wearing a navy Adidas jacket decided to commit a similar robbery on the same block and flee in the same direction, the Court finds that it was reasonable for the police to believe these two robberies were committed by the same person.

Fourth, Officer Bellon observed Carter and saw that Carter looked like the robber. "The fact that every detail provided [in a description] matched the details observed by the officers can contribute to a finding of reasonable suspicion." *Brown*, 448 F.3d at 247 (internal quotations omitted; alterations in original). An officer does not have reasonable suspicion, however, when a defendant merely matches "an excessively general description." *Id.* at 252.

Carter matched a sufficiently detailed description here. Carter was wearing a navy Adidas jacket, which was mentioned in N.K.'s description and visible in both the picture on the police bulletin and the videos Officer Bellon watched. He was also wearing striped pants which were visible in the videos and mentioned in the police bulletin. He was wearing black sneakers which

14

fit the description from the bulletin. He was also wearing glasses, which matched what Officer Bellon saw in the video. In addition to his outfit, Officer Bellon recognized Carter's face from the video. Hr'g Tr. 106-07.

Carter argues that he did not fit the description of the robber because he was wearing different clothes. Carter notes he was wearing glasses, but none of the witnesses' descriptions of the robber mentioned glasses. Officer Bellon testified, however, that the man in the video he watched was wearing glasses. The Court finds this testimony credible and notes that video from the Boost Mobile robbery also shows the robber wearing glasses. Carter next argues that N.K. said the robber was wearing blue pants, but, when police arrested Carter, he was wearing black pants with stripes. While this is a discrepancy, the Court does not think it undermines the Officers' reasonable suspicion. The videos and the other witness description confirm the robber was wearing black pants with white stripes. Carter also argues he was wearing a different hat than the robber. The Court agrees but finds that this distinction is not dispositive. Because Carter was arrested several days after the last robbery, the police could consider that he may have changed hats.

Carter also argues he did not fit the description because of his age. Witnesses described the robber as someone in his 20s whereas Carter was 41. This distinction is not material in this case. Officer Bellon did not need to rely on witness descriptions of the robber's age because he saw several videos of the man he believed to be the robber, and, in those videos, Officer Bellon could see the robber's face. If there had been no video, the discrepancies Carter notes may have undermined Officer Bellon's reasonable suspicion. In light of the video, however, the Court finds Carter's appearance substantially matched the detailed descriptions available to Officer Bellon. [6]

_____

[6] Carter also argues that he did not have the same facial hair as a description provided by one witness to a detective, but Officer Bellon did not see that description. The witness Officer Bellon spoke to, N.K., did not describe the robber's facial hair. Hr'g Tr. 82.

Fifth, Officer Bellon considered Carter's location when he stopped him. When a court considers whether police officers had reasonable suspicion, one factor is "the geographical and temporal proximity of the stop to the scene of the alleged crime." *United States v. Goodrich*, 450 F.3d 552, 561 (3d Cir. 2006). Carter was stopped less than a mile, or about a fifteen-minute walk, from where the robberies occurred. He was northwest of the two cell phone stores, which was the direction the robber fled after both robberies. He was also only a few blocks away from the housing complex where Officer Bellon found the video which he believed depicted the robber.

In sum, the Court concludes that Officer Bellon had reasonable suspicion to stop Carter because Officer Bellon recognized Carter from the videos, N.K.'s description, and the police bulletin, and because Carter was in an area where Officer Bellon reasonably suspected the robber might be. Because Officer Bellon had reasonable suspicion to stop Carter, Carter was not unlawfully seized.

Since Carter's seizure was constitutional, the evidence the police collected should not be suppressed under the fruit of the poisonous tree doctrine. The Court briefly notes, however, that the valid state warrant in this case would likely be an intervening event which would prevent the suppression of evidence the police found after they discovered the warrant. *See Utah v. Strieff*, 136 S. Ct. 2056 (2016) ("The outstanding arrest warrant for [the defendant's] arrest is a critical intervening circumstance that is wholly independent of the illegal stop. The discovery of that warrant broke the causal chain between the unconstitutional stop and the discovery of evidence.")

**B. Carter's Statements to Police**

Carter's statements to the police should not be suppressed because the police did not violate his right against self-incrimination. A defendant must be warned of his right against self-incrimination and his right to an attorney before he can be interrogated by police. *Miranda v.*

*Arizona*, 384 U.S. 436, 444, (1966). Police need not give *Miranda* warnings, however, when they are not interrogating a suspect. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) ("[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation.") A suspect is interrogated when the police either ask questions or engage in other behavior that they "should know [is] reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

Here, none of Carter's statements should be suppressed under *Miranda*. While Carter's Motion to Suppress is not clear about which statements Carter believes should be suppressed, the Court will consider two statements mentioned in the motion: Carter's statement to police asking if he met a description and Carter's statement that his name was James or "Jimmy" Smith.

Carter's statement about fitting a description was not a response to any police questioning or other behavior designed to get Carter to reveal incriminating information. In fact, before Carter made that statement the police had not asked him any questions or done anything to indicate they wanted to hear from him. It was Carter who began asking the Officers questions, and the Officers responded to Carter's questions by assuring him they would tell him more later. The Officers statements to Carter indicated they did not want to talk to him about the reason he was stopped. Carter's voluntary statement about fitting a description should therefore not be suppressed. *See Miranda*, 384 U.S. at 478 ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.").

While Carter's statement that his name was James Smith was in response to a question from police, this question is not subject to *Miranda*. In *Pennsylvania v. Muniz*, the Supreme Court held that "routine booking question[s]" such as a defendant's "name, address, height, weight, eye color, date of birth, and current age" are exempt from *Miranda* warnings. 496 U.S. 582, 601

(1990). This exception applies to questions "reasonably related to the police's administrative concerns." *Id.* at 601-02; *accord Maryland v. King*, 569 U.S. 435, 456 (2013) (summarizing the holding in *Muniz*). Here, the Officers' request for Carter's name is an administrative question. Carter's answer is therefore not suppressible because he was not given *Miranda* warnings.

### C. The Photo Array

The photo array presented to the witnesses was not unduly suggestive. A defendant's due process rights are violated when "an identification procedure is so suggestive that it undermines the reliability of the resulting identification." *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003). A photo array is unduly suggestive "when police attempt to emphasize the photograph of a given suspect, or when the circumstances surrounding the array unduly suggest who an identifying witness should select." *Id.* The defendant bears the burden of showing that the array was unduly suggestive. *Id.*

Here, the police took at least three steps to ensure the photo array would be impartial. First, they used a double-blind procedure in which the detective who administered the photo array did not know the identity of the suspect. *See, e.g.*, *United States v. Caraballo*, 643 F. App'x 163, 170 (3d Cir. 2016) (noting that the "double-blind procedure is highly recommended for reducing the risk of improper law enforcement suggestion"). Second, they showed the witnesses one picture at a time. Third, they chose six people for the photo array who looked like one another. *See United States v. Burnett*, 773 F.3d 122, 133 (3d Cir. 2014) (holding that a photo array was not unduly suggestive when "all of the men in the array were of a similar age; there was no striking difference in the amount of head hair each had; and the skin color of the members of the array was not strikingly different.")

18

According to Carter, these steps were not enough. He argues he stood out in the photo array because he was wearing a distinctive shirt. The Court disagrees. While it is possible that a person may stand out in a photo array if his photo is distinctive, shirt color is not typically an indication of an unduly suggestive photo array. *See, e.g.*, *United States v. Dowling*, 855 F.2d 114, 117 (3d Cir. 1988), *aff'd* 493 U.S. 342 (1990) (rejecting the defendant's argument that a photo array was unduly suggestive because he was the only person in the array wearing a red shirt). Each of the photos in the array at issue here contains a man in a unique shirt. Gov't Hr'g Ex. 11 at 4-10. While Carter's shirt is the only one with a plaid pattern, not all of the other shirts are one solid color. *Id.* Also, the shirts are barely visible in each of the photos because the photos are taken from the neck up. *Id.* In addition, the witnesses never had a chance to compare the photos side-by-side, so they would be less likely to notice any difference in Carter's shirt pattern. Hr'g Tr. 130.

**CONCLUSION**

The police did not violate any of Carter's constitutional rights: they stopped Carter based on reasonable suspicion; they were not required to give Carter *Miranda* warnings before asking him his name; and they did not present an unduly suggestive line up. The Court therefore denies Carter's motion to suppress.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
|---|---|---|
| | : | |
| v. | : | No. 19-78 |
| | : | |
| DARIUS CARTER | : | |

## **ORDER**

AND NOW, this 5th day of December 2019, upon consideration of the Government's

Motion in Limine to Introduce 404(b) Evidence, Defendant Darius Carter's opposition, and the

parties' presentations at the December 2, 2019, final pre-trial conference, it is ORDERED the

Motion (Document 37) is GRANTED in part. The Government may introduce Carter's text

messages to B.W. from prison during its case in chief, however, the Court defers ruling on any

other 404(b) evidence until B.W. testifies.[1]

---

[1] Carter is accused of robbing two cell phone stores. The Government has moved to admit evidence about Carter's recent communications with, and prior relationship with B.W., a witness in this case. The Court concludes the text messages Carter sent to B.W. should be admitted because they are relevant to prove Carter's consciousness of guilt and they are more probative than prejudicial. The remaining evidence the Government seeks to admit could only be relevant if B.W. testifies in Carter's favor at trial so the Court defers ruling on that evidence until B.W. testifies.

B.W. is Carter's ex-girlfriend. The two were dating on and off for eight years. During their relationship, B.W. once called the police because Carter had punched her. She also once filed for a protective order because Carter tried to break into her house after she had kicked him out. When Carter was identified as a suspect in these robberies, the police searched B.W.'s house for evidence. The search did not turn up anything, but B.W. later brought some of Carter's belongings to the police station. B.W. also identified Carter in security footage from the robberies and testified in front of the grand jury. While Carter was in prison, he asked a friend to contact B.W. so she could return his wallet to him. B.W. told this friend that the police had taken Carter's belongings when they searched her house.

When Carter learned B.W. had voluntarily given the police his belongings and testified against him, he sent her several text messages. In these text messages, Carter told B.W. that he was angry because she helped the police and lied to him about her involvement in the case. In one text message he says "when I seen the photos of you taking my stuff to the station and then for you to lie about it (I know they didn't get my stuff from your house, you took it down there) I thought why would you want to betray me in such a matter why would you tell on me? . . . [Y]our betrayal is worse than death!" (misspellings have been corrected). In another text, he quotes a passage in

1

29a

the Quran about how evildoers will be punished and then says "[y]ou think you're winning now, but not for long[;] if you knew what I know you would laugh less and cry more!" (misspellings corrected). B.W. felt threatened by these messages.

The Government wants to use these text messages as evidence of prior bad acts under Rule 404(b). While a prior bad act cannot be used to prove the defendant's propensity to commit crimes, it can be used for another purpose. Fed. R. Evid. 404(b). Evidence of a prior bad act is admissible when it is "(1) offered for a proper non-propensity purpose that is at issue in the case; (2) relevant to that identified purpose; (3) sufficiently probative under Rule 403 such that its probative value is not outweighed by any inherent danger of unfair prejudice; and (4) accompanied by a limiting instruction, if requested." *United States v. Caldwell*, 760 F.3d 267, 277–78 (3d Cir. 2014). Carter's text messages satisfy all four of these requirements.

As the defense concedes, the text messages are relevant to proving Carter's consciousness of guilt—a proper non-propensity purpose. The Third Circuit has clearly held that evidence of a defendant's threatening behavior towards a witness is relevant to prove consciousness of guilt. *See United States v. Gatto*, 995 F.2d 449, 454 (3d Cir. 1993) ("It is well-established that evidence of threats or intimidation is admissible under Rule 404(b) to show a defendant's consciousness of guilt[.]"). In this case, Carter is berating B.W. for "telling on" him and helping police. He also assures her that, because of this behavior, she will "laugh less and cry more." The jury could reasonably use these texts to conclude that Carter was threatening B.W. because he did not want her to provide evidence of his guilt.

The text messages are also more probative than prejudicial. They are probative because they tend to show that Carter wants to hide evidence of his guilt. Carter argues that these text messages are less probative because the Government already has "a mountain" of evidence against Carter. This argument, however, ignores the key issue in the case: mistaken identity. The Government's evidence shows that someone who looked like Carter robbed the cell phone stores, but Carter's text messages could lead the jury to conclude that Carter himself acknowledges he was that person. The Government has no other evidence concerning Carter's subjective feelings about his own guilt.

Any prejudice to Carter from the text messages does not outweigh their probative value. While all 404(b) evidence has some inherent prejudicial effect, the jury is unlikely to use these text messages as propensity evidence. The bad behavior in Carter's text messages, threatening B.W., is not particularly similar to the crime at issue in this case, robbery. Pursuant to the applicable precedent, the Court will also give a limiting jury instruction, which should limit any prejudice caused by introducing these text messages. *See, e.g.*, *United States v. Smith*, 67 F. App'x 686, 691 (3d Cir. 2003) (affirming a trial court's decision to admit evidence that the defendant threatened a witness when the "prejudicial effect was mitigated by the fact that the District Court gave the jury a limiting instruction"); *United States v. Elwell*, 515 F. App'x 155, 162 (3d Cir. 2013) (same).

The Court notes that Carter's text messages may be prejudicial if the jurors are inclined to discriminate against Carter because of his Muslim faith. To avoid this issue, the Court has agreed to include in its voir dire an inquiry as to whether any jurors would be biased based on Carter's religion. By this Order, the Court also instructs the Government to avoid mentioning Carter's Muslim faith or the Quran. Instead, when the Government introduces the text messages, it may read the messages verbatim and elicit testimony that the content of those messages includes quotations from a religious text.

BY THE COURT:

Juan R. Sánchez, C.J.

---

Although the Court will admit these text messages, it does not rule on the remaining evidence the Government seeks to admit. The Government seeks to introduce evidence of Carter's past behavior toward B.W. if B.W. changes her testimony during trial. Until B.W. testifies, the Court cannot determine whether this evidence is relevant and whether the evidence would be more probative than prejudicial. The Court will therefore only admit the text messages at this time. The Government may move to admit any additional 404(b) evidence after B.W. testifies.